UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION


LYNELL B. WINGFIELD,

        Plaintiff,

v.                                  Case No.: 8:09-cv-01090-T-24-TBM

SOUTH UNIVERSITY OF FLORIDA, INC.,

        Defendant.

_____/

**ORDER GRANTING
SUMMARY JUDGMENT**

    The Court now considers the motion for summary judgment filed by Defendant South

University of Florida, Inc., which Plaintiff Lynell B. Wingfield opposes.  (Docs. 55, 81, 58, 82.)

**BACKGROUND**[1]

    A veteran of the U.S. Air Force, Wingfield first experienced leg pain in August 1992

when she injured herself at Camp Bullis, Texas during combat casualty training.[2]  Physicians

diagnosed her with severe shin splints, put her on bed rest, told her to walk on crutches, and gave

her Motrin.  The U.S. Veterans Administration later determined that Wingfield suffered a 10-

---

[1] The Court includes this background only to provide context for its Order.  The Court makes no findings of fact; summary judgment requires that the Court view all facts and draw all reasonable inferences in the light most favorable to the non-moving party, in this case Wingfield.  Where it is necessary to understand the dispute over an issue, the Court has included both sides.

[2] Doc. 58-2 at 3-5.

1

percent disability because of her leg problems.[3]

In 2006, Wingfield joined the faculty of South University of Florida, Inc. as a nursing instructor on the Tampa campus. While an instructor, she sought treatment from Dr. Hamsaveni Kambam, her primary care physician at the James Haley Veterans Hospital in Tampa, for shin splints and leg pain.[4] In July 2007, Wingfield injured herself at home and underwent foot surgery. Her recovery required her to rest and remain in a wheelchair. During this time, Wingfield continued to teach—from a wheelchair—her nursing classes at South University. She taught from her wheelchair. In October 2007, Wingfield was in a car accident and suffered injuries to her back, neck, shoulder, knee and other parts of her body. In addition to seeing her primary care physician, she began regularly seeing a chiropractor, Thomas Andrew Aguero.[5]

In April 2008, Dr. Doris Parrish, the nursing program director at South University, discovered that she had made an error in scheduling instructors to teach upcoming classes. Because of this error, Parrish needed an instructor to teach an extra lab course. The course was an eight-week course and would require the instructor to teach for four additional hours every two weeks, in addition to teaching their normal course load. In an April 7, 2008 e-mail to nursing faculty, Parrish asked for volunteers.[6] When Parrish did not get enough volunteers, she assigned Wingfield to co-teach the course with another instructor. She informed the instructors

---

[3] Wingfield Aff. ¶ 5. Doc. 58-2 at 1. Wingfield has not provided the Court with the VA medical records that classify her as disabled. She has only provided her sworn affidavit and radiology reports that refer to her self-reported classification.

[4] Doc. 69 at 12.

[5] Although the cover page of Aguero's deposition lists him as a M.D., Aguero's deposition testimony shows that he is not a medical doctor and did not attend medical school. Doc. 67 at 5.

[6] Doc. 46 at 119.

of the new schedule in an e-mail sent at 8:13 a.m. on April 15, 2008.[7]

At 9:11 a.m. on April 15, 2008, Wingfield replied to Parrish by e-mail. She copied her e-mail to Dr. Dan Coble, who, as campus president, was Parrish's boss.[8] Wingfield's e-mail said, in part:

> This looks good but I am sorry to tell you that you will have to redo this schedule. I tried to explain to you that the reason I come in here everyday is because I need that time to adequately prepare for my students. I have many little jobs that no one wants. I worked until 9 p.m. last night. . . . Since I know that I am probably fired, I will turn in my resignation tomorrow.

At 11:21 a.m. Parrish replied in an e-mail, also copied to Dr. Coble.[9] Parrish wrote:

> I am sorry that you feel that way, Lynell. I have tried my best to work this out so that there is a sharing of responsibility. Everyone is busy. I will not redo the schedule. You are welcome to work out a plan with your peers if you choose to do so. . . . I will support whatever decision you make.

At 12:03 p.m., Wingfield responded:

> I can not take on another job. . . . I can not kill myself. I know my limitations. I worked until 9 p.m. last night and then again this morning on my presentation. I also tutored a student this morning in procaic. I am stretched to the max.

Two days later on April 17, 2008, Wingfield obtained a letter from her chiropractor, which Parrish later read.[10] The letter stated:

> Ms. Lynell Wingfield is currently [being] treated in this office for Cervical hyperflexion/ extension injury complicated by cervical and thoracic segmental dysfunction. . . . Ms. Wingfield is progressing slower than anticipated due to high stress levels. Please note she is also suffering from a cervical disc herniation which can complicate her condition, especially with high stress. It is my recommendation that Ms. Wingfield remain on light duty until a re-evaluation is performed in 2 weeks.

---

[7] Doc. 46 at 120.

[8] Id.

[9] Id.

[10] Doc. 46 at 123. Although the letter is dated May 1, 2009, South University acknowledges in its Statement of Facts that the letter was actually written on April 17, 2008. Doc. 55 at 7 ¶ 9.

On April 21, 2008, Dr. Kambam and a VA social worker, Karen Perez, also wrote Parrish a letter.[11]  The letter said that Wingfield had been treated since December 2007 for stress.  "Ms. Wingfield is unable to accept additional duties at this time, as it will interfere with her treatment goals and her physical and mental well being."

Dr. Kambam and Perez also invited Parrish or school administrators to call them with questions.  No one from South University called.

On April 22, 2008, Wingfield sent Parrish a two-page letter, which she copied to Coble, that asserted that Parrish had mistreated her and discriminated against her.  The letter stated, in part:

> My stress level is extremely high and my blood pressure is abnormally high. . . . I work everyday of the week because I need Mondays, Tuesday mornings and Friday mornings to prepare.  I did not ask for a "light load," I asked you not to "increase" my duties. . . .
> [I] came to you in fear of my life, fearing that I might stroke out if I have an increase in my duties.  You would empathize with a patient who is highly stressed.  Yet, as your employee, you showed no empathy toward me. . . .
> I came to work after my surgery in [a] wheelchair, on crutches, and after my accident when I was on strict bed rest. . . . [I] have given 110% every single day I have come to work. . . .
> I am stressed.  I have high blood pressure.  I have frequent headaches.  I have a busy schedule.  All I asked you for was a reprieve from the lab this time and that I would work the lab next quarter.

At some point, Parrish also asked Coble, the campus president, to intervene.  He declined to do so, saying that the issue should be handled by Parrish.

On April 30, 2008, Parrish e-mailed Wingfield a letter placing her on unpaid sick leave.  In the e-mail, Parrish wrote, "Please know that your health is of paramount importance in this

---
[11] Doc. 46 at 122.

matter." The attached letter said:[12]

> It is clear from your physician and clinician statements of April 17, 2008 and April 21, 2008 that you are not able to continue with your duties as nursing faculty at this time. . . . Therefore, please be advised that you are placed on sick leave until you can return to work and resume your full time responsibilities as assigned. A medical clearance with no limitations to return to work will be required.

Parrish also wrote that Wingfield could contact a human resources coordinator about short-term disability. Although the issue is in dispute, Wingfield claims that when she sought paid sick leave, school administrators told her she did not qualify.

Several communications from Wingfield to school officials, including the chancellor of South University, followed. Wingfield also hired an attorney. Her medical providers also sent South University follow-up letters. A May 19, 2008 letter from Dr. Kambam and Karen Perez, the VA social worker, to Parrish stated:[13]

> We are not sure how you interpreted our recommendation that Ms. Wingfield is "unable to accept additional duties at this time" as a clear statement that she is unable to work. We did not place Ms. Wingfield on sick leave. . . . Ms. Wingfield is able and capable of performing her current duties as assigned, but is unable to accept additional duties at this time as it will interfere with her treatment goals.

The letter invited Parrish to call either of them with questions. She did not call them.

Aguero, the chiropractor, also wrote South University a letter dated May 15, 2008. It stated:

> At no time did I insinuate or declare that Ms. Wingfield "is unfit" to work nor did I place her on sick leave. I clearly stipulated that I was placing her on light duty. Perhaps the term "light duty" is causing the error in communication. Therefore, I am rephrasing my terminology. . . . It is my recommendation that Ms. Wingfield is able to perform her current work activities with no additional assigned duties until a re-evaluation in 3 weeks.

Aguero also invited school administrators to call him. They did not do so.

---

[12] Doc. 46 at 124.

[13] Doc. 46 at 125.

Thirty-one days after Wingfield's unpaid sick leave began, Coble, the campus president, wrote Wingfield a letter dated May 19, 2008 ending her unpaid sick leave.[14]  He also authorized South University to retroactively pay Wingfield $2,403.85 for her lost salary between April 28, 2008 and May 20, 2008.[15]  He said he was doing so after receiving the two follow-up letters from Wingfield's medical providers.  "I apologize for any confusion that may have occurred surrounding the extent of your medical issues and your ability to continue in the workplace," Coble wrote.  He asked Wingfield to return to work on May 22, 2008.  He also addressed Wingfield's concern that Parrish or others would retaliate against her.  "Retaliation of any type would not be tolerated by me and has no place on this campus.  You have my personal assurance that I would act swiftly and decisively to investigate and alleviate such conditions."[16]

Wingfield testified that she did not receive Coble's May 19, 2008 letter.[17]  However, she also testified she did not want to return to South University if it meant working for Parrish.  At some point, either Wingfield or her attorney asked that Wingfield be allowed to report to another school administrator.  But South University did not agree to this new condition.  Wingfield also testified that she lacked confidence in Coble's promise to "act swiftly and decisively" to resolve future problems given how he handled the past dispute with Parrish.

When Wingfield failed to report for work on May 22, 2008, Coble sent her another letter.[18]  Wingfield acknowledges that she received this letter.  Coble's letter indicated that he

---

[14] Doc. 56 at 6-7.

[15] Id.; see also Doc. 56 at 8.

[16] Doc. 56 at 6-7.

[17] Doc. 43 at 89-90.

[18] Doc. 56 at 8.

had heard reports that Wingfield accused Parrish of causing others to make "offensive" remarks about her. (Wingfield later alleged that Parrish made defamatory remarks about her, but Wingfield ultimately abandoned this allegation.) Coble promised a full investigation and placed Wingfield on paid leave through May 30, 2008 to give him time to complete the investigation.

On June 4, 2008, Coble wrote Wingfield to report that his investigation found no basis for Wingfield's allegations about "offensive" calls being made to her house by South University faculty. He invited Wingfield to return to work the next day, June 5, 2008. If Wingfield decided not to return, Coble offered to place her on unpaid leave through June 13, 2008, which was the date of a mediation session between the parties. Wingfield did not return to work on June 5, 2008. Nevertheless, South University kept Wingfield on unpaid leave status through August 2008, at which time Wingfield learned that her health insurance had been discontinued.[19]

On August 12, 2008, Wingfield filed a charge of discrimination against South University with the Florida Commission on Human Relations. After the Commission on May 8, 2009 issued Wingfield a notice of the right to sue, Wingfield filed suit in state court. The lawsuit was removed to U.S. District Court on June 10, 2009.

In earlier rulings, the Court dismissed four of the 11 counts in Wingfield's Amended Complaint.[20] Six counts of Wingfield's Amended Complaint survive. The remaining counts include:

---

[19] Doc. 19 at 8 ¶ 37.

[20] The Court dismissed four counts of Amended Complaint on an unopposed motion. The dismissed counts included Counts I and II, which alleged unlawful termination based on race; Count VIII, which alleged unlawful limitation, segregation or classification based on handicap under the FCRA; and Count X, which alleged breach of contract. (Doc. 20.) The Court also granted partial summary judgment in favor of Defendant Dorish Parrish as to Count XI, a defamation claim against Parrish only. (Doc. 52.) Wingfield also did not oppose the grant of partial summary judgment in favor of Parrish (Doc. 51) and the entry of judgment in favor of Parrish on Count XI. (Docs. 59, 60.)

- In Counts III and IV, Wingfield alleges that South University unlawfully terminated her based on her disability in violation of the Florida Civil Rights Act ("FCRA") and the Americans with Disabilities Act ("ADA").

- In Counts V and VI, Wingfield alleges that South University unlawfully failed to make a reasonable accommodation for her handicap in violation of the FCRA and the ADA.

- In Count VII, Wingfield alleges that South University unlawfully retaliated against her based on her opposition to the university's violations of the ADA.

- In Count IX, Wingfield alleges that South University unlawfully limited, segregated, or classified her based on her handicap in violation of the ADA.

Wingfield seeks damages, including back pay with interest for lost wages and lost fringe benefits, compensatory damages including damages for mental anguish and loss of dignity, front pay, prejudgment interest, court costs and reasonable attorney's fees, and punitive damages. Wingfield also asks the Court to issue a declaratory judgment that South University violated the ADA and to issue an injunction to prohibit future violations of the law.

### STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."[21] The Court must draw all inferences from the evidence in the light most favorable to the non-moving party and resolve all

---

[21] Fed. R. Civ. P. 56(c).

reasonable doubts in that party's favor.[22]  Therefore, the moving party bears the initial burden of showing the Court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial.  Id.  When the moving party has discharged its burden, the non-moving party—in this case, Wingfield—must then go beyond the pleadings, and by her own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing there is a genuine issue of material fact for trial.  Id.

The court "must avoid weighing conflicting evidence or making credibility determinations" at the summary judgment stage.  "It is not the role of the court to weigh the facts.  Rather the determination is of whether . . . there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."[23]

"Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."[24]  In determining whether there is a "genuine" issue, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."[25]  In addition, a dispute about a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party.[26]  "If the evidence is merely

---

[22] Porter v. Ray, 461 F.3d 1315, 1320 (11th Cir. 2006).

[23] Hilburn v. Murata Elecs. N. Am., 181 F.3d 1220, 1225 (11th Cir. 1999) (internal quotations and citations omitted).

[24] Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).

[25] Id. at 251-52.

[26] Id. at 248.

colorable, or is not significantly probative, summary judgment may be granted. . . . The mere existence of a scintilla of evidence in support of the Plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]."[27]

## ANALYSIS

Wingfield brings parallel claims under both the FCRA and the ADA. "Because Florida courts construe the FCRA in conformity with the ADA, a disability discrimination cause of action [under the FCRA] is analyzed under the ADA."[28] Therefore, the Court considers the two claims together under the same standard.

In analyzing Wingfield's claim under the ADA, the Court applies the version of the ADA in effect as of August 12, 2008,[29] rather than the considerably more liberal version of the ADA passed by Congress in September 2008, which became effective on January 1, 2009.[30] Wingfield does not argue that the new law should apply retroactively, and therefore, she waives this argument.[31]

───────────────

[27] Id. at 249-50, 252.

[28] Corboda v. Dillard's, Inc., 419 F.3d 1169, 1175 (11th Cir. 2005) (citing Wimberly v. Sec. Tech. Group, Inc., 866 So. 2d 146, 147 (Fla. 4th DCA 2004)).

[29] August 12, 2008 is the date that Wingfield filed a charge of discrimination with the Florida Commission on Human Relations, and appears to be on or near Wingfield's last day on unpaid leave as a South University employee. (Doc.19 at 22.)

[30] See ADA Amendments Act of 2008, 122 Stat. 3553, Pub. L. No. 110-335. The 2008 law overturned the Supreme Court's strict standards for determining disabilities, set in Toyota Motor Manufacturing, Kentucky, Inc. v. Williams, 534 U.S. 184 (2002), and Sutton v. United Air Lines Inc., 527 U.S. 471 (1999). The law states that as a result of the Supreme Court's rulings in these cases, "lower courts have incorrectly found in individual cases that people with a range of substantially limiting impairments are not people with disabilities" and that the Supreme Court in Toyota Motor Manufacturing "interpreted the term 'substantially limits' to require a greater degree of limitation than was intended by Congress." Importantly for Wingfield's case, the new law changes the definition of "disability."

[31] Although the Court does not need to consider this argument, the Court notes that at least five federal courts of appeals have ruled that the 2008 law does not apply retroactively. See Lytes v. D.C. Water & Sewer Auth., 572 F.3d 936, 940-42 (D.C. Cir. 2009); EEOC v. Agro Distr., LLC, 555 F.3d 462, 469 n.8 (5th Cir. 2009);

## I. **Counts III, IV, V, VI, and IX**: **Wingfield Has Not Offered Evidence For a Jury to Find She Suffered an Impairment that Substantially Limited a Major Life Activity**

In order for Wingfield to prove that South University unlawfully fired her, unlawfully failed to reasonably accommodate her disability, or unlawfully limited, segregated, or classified her, Wingfield must first prove that South University took these actions for a discriminatory reason. To make out a prima facie case of disability discrimination, Wingfield must prove (1) that she has a statutorily covered disability, (2) that she is a qualified individual, and (3) that South University discriminated against her because of her disability.[32]

Wingfield cannot establish a prima facie case because she failed to present sufficient evidence from which a jury could find that she suffers from a statutorily covered disability, satisfying the first element of all of her discrimination claims. In order for Wingfield to prove that she has a statutorily covered disability, she must prove either: (1) that she has a physical or mental impairment that substantially limits one or more major life activities of an individual; (2) that she has a record of such an impairment that substantially limits one or more major life activities, or (3) that she is regarded as having an impairment that substantially limits one or

---

Milholland v. Sumner County Bd. of Educ., 569 F.3d 562, 565-66 (6th Cir. 2009); Kieswetter v. Caterpillar, Inc., 295 F. App'x 850, 851 (7th Cir. 2008); Barnes v. GE SEC, Inc., 342 F. App'x 259, 262 (9th Cir. 2009).

    The Eleventh Circuit has not confronted this issue, except in an unpublished opinion that carries no precedential value, where a pro se plaintiff failed to raise the argument. See Fikes v. Wal-Mart, Inc., 332 F. App'x 882, 883 n.1 (11th Cir. 2009). See also Shannon v. Postmaster Gen., No. 08-16827, 2009 WL 1598442, at *2 n.5 (11th Cir. June 9, 2009) (noting the absence of an Eleventh Circuit published opinion on the issue).

    However, several federal district courts in the Eleventh Circuit have held that the 2008 law does not apply retroactively. See Lawson v. Plantation Gen. Hosp., L.P., __ F. Supp. 2d. __, 2010 WL 1258058, at *12-14 (S.D. Fla. March 30, 2010); Hernandez v. Mohawk Indus., Inc., No. 6:08-cv-927-Orl-28-GJK, 2009 WL 3790369 (M.D. Fla. Nov. 10, 2009); Palmer v. Albertson's, LLC, No. 4:09-cv-00137-SPM-WCS, 2010 WL 785652, at *3 n.2 (N.D. Fla. March 3, 2010).

    [32] Pritchard v. S. Co. Servs., 92 F.3d 1130, 1132 (11th Cir. 1996).

more major life activities.[33]

A.     *Proof of an Impairment*

Wingfield's First Amended Complaint does not identify her disability, other than to assert that she suffers from one. But South University argues that Wingfield in her deposition limited her disability claim only to shin splints—not disability from stress or other leg impairments such as Compartment Syndrome. After reading both of Wingfield's depositions in full, the Court does not read her testimony so narrowly. In her first deposition on September 17, 2009, counsel asked Wingfield: "In what way are you disabled, as of the current time?" She replied: "I have a disability in my legs."[34] She then explained that she was diagnosed in 1994 with Compartment Syndrome, which she explained (perhaps incorrectly) was a form of severe shin splints.[35] Wingfield also testified, generally, about suffering leg ailments that made it painful to walk or stand for extended periods of time. The Court reads Wingfield's testimony to assert a claim for a leg impairment, which could include shin splints, Compartment Syndrome, and an unspecified ailment that has caused her chronic leg pain, particularly when her legs are stressed. But the Court agrees that Wingfield, in her deposition, backed off any claim that she suffers from a mental disability. She clearly stated in her deposition that she is not asserting a claim for a disability caused by psychological stress.

After arguing that Wingfield limited her claim to shin splits, South University next argues that no evidence exists that Wingfield has shin splints. South University bases this

---

[33] Id.; 42 U.S.C. § 1202(1).

[34] Doc. 43 at 4-5.

[35] Dr. Kambam, one of Wingfield's treating physicians, testified in his deposition that Compartment Syndrome and shin splints are not related conditions. (Doc. 69 at 68-69.)

argument on Dr. Kambam's deposition, in which he testified that a particular X-ray did not show signs of shin splits.[36] But Dr. Kambam, a primary care physician, qualified his testimony about the X-ray because he is not a radiologist with special training to read X-rays.[37] Elsewhere in his deposition, Dr. Kambam testified that Wingfield was diagnosed with shin splints in the past. He also testified about Wingfield reporting severe leg pain and chronic shin splints. He testified he gave her Tylenol to ease her pain from the shin splints.

Although the issue may be debatable, Wingfield presented evidence in the form of military medical records and testimony from two treating physicians, a chiropractor, as well as her own testimony, from which a jury could find that she suffered leg pain from either shin splints or Compartment Syndrome.[38]

**B.**     _Proof of a Substantial Limitation_

But to survive summary judgment, Wingfield must do more than create a jury issue that she suffers from a leg impairment. The impairment must "substantially limit" a "major life activity." The Supreme Court has said that the term "substantially limits" means a "considerable" limitation or a limitation "to a large degree."[39] The plaintiff "must have an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives. The impairment's impact must also be

---

[36] Doc. 69 at 53, 80.

[37] Doc. 69 at 12, 18, 21, 23, 40-41, 54-55.

[38] Dr. Dana Glen, another treating physician at the James Haley Veterans Hospital, testified that Wingfield suffers from chronic leg pain. (Doc. 83 at 63.) She also testified that historical medical records stated that Wingfield suffered from severe shin splints in the past. (Doc. 83 at 76-79.) The Court recognizes that it is debatable whether Wingfield's leg pain is chronic or temporary.

[39] Toyota Motor Mfg., 534 U.S. at 196-97.

permanent or long term."[40]  The law measures a "substantial limitation" against the yardstick of a normal person.  "In general, 'substantially limits' means the inability to perform a major life activity as compared to the average person in the general population or a significant restriction 'as to condition, manner or duration under which an individual can perform.'"[41]  A plaintiff cannot merely present evidence of a medical diagnosis; she must show how the impairment substantially limits her life in a meaningful way.   The Supreme Court has said that courts should strictly interpret the ADA's terms to prevent the ADA from becoming a statutory crutch for people with bumps and bruises.  For this reason, the ADA imposes a "demanding standard" for plaintiffs to overcome.[42]

In response to this Court's request for supplemental briefing on this issue, Wingfield argues that her impairment substantially limits her ability to walk and to stand.[43]  Courts have recognized both walking and standing as "major life activities" under the ADA.[44]  Wingfield argues that several pieces of evidence create a genuine issue from which a jury could find that she suffered from an impairment that substantially limited her ability to walk and stand.

First, in a sworn affidavit, Wingfield states that the Veterans Administration classified her as 10 percent disabled based on her leg injury during combat training.[45]  But this evidence

---

[40] Id.

[41] Allen v. U.S. Postmaster Gen., 158 F. App'x 240, 242 (11th Cir. 2005).

[42] Toyota Motor Mfg., 534 U.S. at 197.

[43] Wingfield apparently has abandoned her claim in the First Amended Complaint that her impairment substantially limits the major life activity of working.  (Doc. 19 ¶ 22.)

[44] 29 C.F.R. Pt. 1630, App. § 1630.2(I).

[45] Doc. 58-2 at 1.

does not advance Wingfield's claim past summary judgment for two reasons. First, the VA's disability rating apparently accounts for loss of earning capacity and involves "a completely different inquiry" than the one the Court must perform.[46] "Indeed, this difference in definitions is precisely why 29 C.F.R. 1630, App. § 1630.2(k) cautions that such disability rating is not interchangeable with the strict definition of disability under the ADA."[47] Second, even if the Court could correlate the VA's disability classification with the ADA's, a 10 percent disability shows that a person suffers a partial, rather than a substantial, limitation. Indeed, courts have found that disability ratings of 20 percent and 47 percent do not alone provide sufficient evidence of a substantial limitation.[48]

Wingfield also points to the deposition testimony of her two treating physicians, Dr. Kambam, a primary care physician who last saw her in September 2008, and Dr. Glen, a family physician who treated her in 2010. Dr. Kambam testified that Wingfield sought treatment for leg pain, including pain from shin splints, while working at South University. He also testified that

---

[46] Thorn v. BAE Sys. Hawaii Shipyards, Inc., 586 F. Supp. 2d 1213, 1221-23 (D. Hawaii 2008).

[47] Id. See also Knight v. Computer Sciences Raytheon, No. 6:00-cv-1563-Orl-28-DAB, 2002 WL 32818520, at *8 (M.D. Fla. Oct. 25, 2002) ("The fact that an individual has a record of being a disabled veteran, or of disability retirement, or is classified as disabled for other purposes does not guarantee that the individual will satisfy the definition of 'disability'" under the ADA.).

[48] The district court in Thorn cited the following cases:

- DiCarlo v. Potter, 358 F.3d 408, 418 (6th Cir. 2004), where the Sixth Circuit held that the VA's determination that the plaintiff had a 20 percent leg disability "is insufficient to demonstrate that DiCarlo is substantially limited in a major life activity";
- Mahon v. Crowell, 295 F.3d 585, 592 (6th Cir. 2002), where the Sixth Circuit held that evidence that plaintiff's impairment caused a 47 percent loss of access to the job market was insufficient to establish a disability;
- Lebron-Torres v. Whitehall Laboratories, 251 F.3d 236, 240-41 (1st Cir. 2001), where the First Circuit found that State Insurance Fund's finding of a 20percent disability and evidence of on-going treatment "is insufficient by itself to establish that [plaintiff] was substantially limited in the [major life activity of working]." Id. at 1223.

Wingfield's leg pain could affect her ability to walk.[49]  But Dr. Kambam did not testify that the impairments substantially limited her ability to walk or stand.  In fact, his testimony suggests that her impairment was manageable.  For example, Dr. Kambam testified that he treated Wingfield for shin splints in June 2008—by giving her Tylenol.  He testified that she did not need more powerful pain medication.[50]  Dr. Kambam also signed a letter to South University in April 2008, stating that Wingfield could not take on additional duties.[51]  But the letter did not state that Wingfield needed to reduce her already-full workload.  In his deposition, Dr. Kambam testified that he felt that Wingfield could sit and walk in April 2008 at her then-current levels.  She just could not stand for a long time, although Dr. Kambam did not explain what a "long time" meant.[52]  Similarly, Dr. Glen testified that Wingfield should not walk or stand for long hours.  But Dr. Glen did not testify that Wingfield should not walk at all, or not walk as much as people in her situation normally do.[53]

Wingfield's chiropractor, Thomas Andrew Aguero, testified that he did not think Wingfield should walk or stand uninterrupted for 60 minutes.[54]  But he also testified that Wingfield could walk or stand for four extra hours every other week, which was the amount of time she would have spent in the extra lab class that South University told her to teach.  In an

---

[49] Doc. 69 at 58-70.

[50] Doc. 69 at 39-41.

[51] Doc. 42 at 16.

[52] Doc. 69 at 28-30.

[53] Doc. 83 at 40.  Much of Dr. Glen's deposition testimony was equivocal as Dr. Glen could not answer numerous questions without further research or looking at Wingfield's medical records.

[54] Doc. 67 at 35-40.

April 17, 2008 letter, Aguero recommended that South University place Wingfield on "light duty," but he also said he would re-evaluate the need for "light duty" in two weeks. By seeking to re-evaluate her in two weeks, the chiropractor's letter shows that Wingfield's impairment was temporary, rather than "permanent or long term."[55]

The testimony of these three health professionals show that Wingfield's leg injury prevented her from walking or standing for long period of times without a break. But none of the testimony supports the assertion that her ability to walk or stand was substantially limited, as measured by her normal activities and the activities of other nursing instructors. Simply because Wingfield's impairment prevented her from substantially *increasing* her activities does not mean that it required her to substantially limit her activities.[56]

Even if the medical testimony existed, the Supreme Court made it clear in <u>Toyota Motor Manufacturing</u> that a court cannot look only at medical diagnostic labels to determine whether a plaintiff suffers a statutorily-covered disability. On a case by case basis, a court must evaluate whether an impairment substantially affects how a person actually lives. In this case, Wingfield offers almost no testimony that her leg impairment altered her life. In fact, she testified that she taught a full load of courses—and did so standing. In fact, Wingfield testified that she regularly worked at South University until the security guard closed the building at night and spent countless extra hours tutoring students. All of this extra work necessarily involved some walking and standing. Wingfield also offered no evidence that her leg impairment prevented her

---

[55] <u>Toyota Motors Mfg.</u>, 534 U.S. at 196-97.

[56] <u>See</u> <u>Roberts v. Rayonier, Inc.</u>, 135 F. App'x 351, 356 (11th Cir. 2005) ("We have stressed that 'substantially limits' means 'prevents or severely restricts' rather than requiring only a 'diminished activity tolerance.'") (citing <u>Rossbach v. City of Miami</u>, 371 F.3d 1354, 1358 (11th Cir. 2004) and <u>Hilburn v. Murata Electronics</u>, 181 F.3d 1220, 1228 (11th Cir. 1999)).

normal tasks, such as walking around the house, walking while shopping for groceries, and standing to cook a meal or take out the trash.  In the absence of any testimony that Wingfield's ability to walk and stand was substantially limited, the Court must assume that she could walk and stand normally, even though she could not do so for long hours.

For these reasons, Wingfield has not offered any evidence from which a jury could find that her leg impairment substantially limited a major life activity.  For the same reasons, Wingfield has not offered any evidence that she had a history of an impairment that substantially limited a major life activity, or that South University regarded her as having such an impairment. In fact, Wingfield offers no evidence that South University placed Wingfield on sick leave permanently.  The evidence shows that South University put her on medical leave temporarily, until her condition improved.[57]  As a result, Wingfield cannot prove that she suffered from a statutorily covered disability and, thus, cannot prove that South University discriminated against her based on a disability that she did not have.

## II.    Counts III and IV:  Wingfield Has Not Offered Evidence For a Jury to Find that South University Fired Her

Because Wingfield cannot prove that she suffered a statutorily covered disability, the remaining discrimination claims in Wingfield's Amended Complaint must fail.  But Counts III and IV, which allege unlawful termination, fail for another reason too.  In order to prove an unlawful termination claim, Wingfield must show that South University either actually fired her or constructively fired her.  She has failed to create a jury issue that South University fired her, either actually or constructively.

---

[57]  The letter placing Wingfield on sick leave states: "[Y]ou are placed on sick leave until you can return to work. . . ."  (Doc. 46 at 124.)  In an e-mail to other nursing instructors, Parrish wrote: "Lynell is out on sick leave for at least the next couple of weeks."  (Doc. 46 at 135.)

**A.** _Actual Discharge_

To determine whether South University actually fired Wingfield, a jury must conclude that South University "by acts or words, show[ed] a clear intention to dispense with the services of the employee."[58]  This analysis focuses on the employer's intent, not the employee's subjective understanding of the employer's actions.[59]

In this case, Wingfield has not presented any evidence that South University intended to terminate Wingfield.  The university placed her on unpaid sick leave with the express understanding that she would return when her medical condition improved.[60]  A month later, South University reversed course and asked Wingfield to return to work.  It also attempted to retroactively pay her the income she missed.  When Wingfield failed to return to work in May 2008, it kept her on unpaid leave until August 2008.  If Wingfield had returned, it is undisputed that she would have continued to teach at South University.  Instead, she abandoned her job.

**B.** _Constructive Discharge_

Even if South University did not actually fire Wingfield, it can still be liable for unlawful termination if it constructively discharged her for discriminatory reasons.[61]  To prove that South University constructively fired her, Wingfield "must demonstrate that working conditions were 'so intolerable' that a reasonable person in her position would have been compelled to resign."[62]

---

[58] Thomas v. Dillard Dep't Stores, Inc., 116 F.3d 1432, 1434 (11th Cir. 1997) (quoting Payne v. Crane Co., 560 F.2d 198,199 (5th Cir. 1977)).

[59] Id.

[60] Doc. 46 at 124, 135.

[61] Doe v. Dekalb County Sch. Dist., 145 F.3d 1441, 1450 (11th Cir. 1998) (citing Young v. S.W. Sav. & Loan Ass'n, 509 F.2d 140, 144 (5th Cir. 1975)).

[62] Griffin v. GTE Florida, Inc., 182 F.3d 1279, 1283 (11th Cir. 1999) (internal citations omitted).

There must be a "[h]igh degree of deterioration in an employee's working condition" to prove constructive discharge.[63]  In fact, "[t]he standard for proving constructive discharge is **_higher_** than the standard for proving a hostile work environment."[64]  And as the Eleventh Circuit has made clear, the standard for proving a hostile work environment is quite high indeed.[65]  With such an imposing barrier to overcome, courts have failed to find that an employer constructively discharged plaintiffs in situations more egregious than in this case.  For instance:

- In <u>Dale v. Wynne</u>, the district court found that no constructive discharge occurred when an employee returned to work, only to have her new supervisor barely acknowledge her presence at their first meeting, before dismissing her.[66]  The supervisor only communicated with the employee by e-mail, told the employee's peers that he needed to approve anything she did, and would not allow her to manage her subordinates.  He also had a sign in his office that said: "Fear, sarcasm and intimidation are acceptable leadership traits when used in moderation."[67]

---

[63] <u>Hill v. Winn-Dixie Stores, Inc.</u>, 934 F.2d 1518, 1527 (11th Cir. 1991).

[64] <u>Hipp v. Liberty Nat'l Life Ins. Co.</u>, 252 F.3d 1208, 1231 (11th Cir. 2001) (emphasis added), <u>modified on other grounds</u>, <u>Anderson v. Cagle's, Inc.</u>, 488 F.3d 945 (11th Cir. 2007).  <u>See also</u> <u>Dale v. Wynne</u>, 497 F. Supp. 2d 1337, 1344 (M.D. Ala. 2007) (applying the same law to a claim under the Rehabilitation Act, which is governed by the same standards as the Americans with Disabilities Act).

[65] To prove a hostile work claim, a plaintiff must show that "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." <u>Harris v. Forklift Sys., Inc.</u>, 510 U.S. 17, 21 (1993) (internal quotations and citations omitted).

[66] <u>Dale v. Wynne</u>, 497 F. Supp. 2d 1337, 1344-45 (M.D. Ala. 2007).

[67] <u>Id.</u> at 1340.  Although <u>Dale</u> involved a claim under the Rehabilitation Act, "[d]iscrimination claims under the Rehabilitation Act are governed by the same standards used in cases brought under the Americans with Disabilities Act of 1990.  Accordingly, cases decided under the Rehabilitation Act are precedent for cases under the ADA and vice-versa." <u>Id.</u> at 1341 (internal citations and quotations omitted).

- In <u>Richio v. Miami-Dade County</u>, the district court found that no constructive discharge occurred when a supervisor telephoned her daily while she was on medical leave, another supervisor delivered papers to her hotel room rather than give the papers to a co-worker, told others that she was "faking" her medical condition, and remarked, "Why don't you just leave and find another job?"[68]

- In <u>Stedman v. Bizmart, Inc.</u>, the district court found no constructive discharge occurred when an employee became so stressed after a manager repeatedly showed disgust in front of a group of co-workers when he could not answer a question, timed him on his ability to finish a task, and asked him to work the Saturday after his stepmother's death, among other incidents.[69]

By comparison, the Eleventh Circuit in <u>Poole v. Country Club of Columbus, Inc.</u>, allowed a constructive discharge claim to survive summary judgment where an employee resigned after she was stripped of all responsibilities, given a chair but no desk, and was isolated from conversations with co-workers.[70]

In this case, Wingfield claims that workplace conditions became intolerable  because Parrish placed her on unpaid sick leave and then South University insisted that she continue to report to Parrish upon her return.  Wingfield feared that Parrish would retaliate against her in some unspecified way when she returned.  But aside from placing Wingfield on unpaid sick

---

[68] <u>Richio v. Miami-Dade County</u>, 163, F. Supp. 2d 1352, 1367-68 (S.D. Fla. 2001).

[69] <u>Stedman v. Bizmart, Inc.</u>, 219 F. Supp. 2d 1212, 1217-1219, 1224-25 (N.D. Ala. 2002).

[70] <u>Poole v. Country Club of Columbus, Inc.</u>, 129 F.3d 551, 553 (11th Cir. 1997). Although <u>Poole</u> was a case under the Age Discrimination In Employment Act, the same standard for constructive discharge applied in <u>Poole</u> as applies in this case. <u>Id.</u> at 553 (citing <u>Thomas v. Dillard Dep't Stores, Inc.</u>, 116 F.3d 1432, 1433-34 (11th Cir. 1997)).

leave, Wingfield does not allege that Parrish took any other specific action to make the workplace intolerable.[71]  Wingfield's feelings and fears cannot, as a matter of law, constitute grounds for a jury to find that South University constructively fired her.  "In assessing a constructive discharge claim, the plaintiff's subjective feelings about his employer are not considered."[72]  Instead, "the court employs an objective standard: whether a reasonable person in the plaintiff's position would have been compelled to resign."[73]  No reasonable person would feel compelled to resign under these circumstances.  First, South University's decision to place Wingfield on unpaid sick leave does not constitute the type of egregious conduct that makes workplace conditions intolerable, as defined by the Eleventh Circuit.  Second, these workplace conditions could not be considered intolerable where South University pledged to stop any retaliation, admitted it erred in placing her on unpaid sick leave, and then tried to retroactively pay Wingfield her lost pay.  Second, in disability discrimination claims, as in Title VII claims, the law "does not create a cause of action for constructive discharge where the employee assumes the worst and resigns before giving management a chance to rectify the situation."[74]  Unless the employer gets sufficient time to remedy the intolerable working conditions, "a constructive discharge generally will not be found to have occurred."[75]  In this case, Wingfield

---

[71] At one point in this case, Wingfield alleged that Parrish made defamatory remarks about her to co-workers and students.  But Wingfield gave up her defamation claim when she failed to oppose South University's motion for partial summary judgment on the claim.  In her response to South University's summary judgment motion on all remaining claims, Wingfield does not claim that workplace conditions were "intolerable" because Parrish or other employees made offensive remarks about her.  (Doc. 58 at 10-11.)

[72] Stedman, 219 F. Supp. 2d at 1212 (internal citation omitted).

[73] Id.

[74] Kimsey v. Akstein, 408 F. Supp. 2d 1281, 1303 (N.D. Ga. 2005).

[75] Luna v. Walgreen Co., 347 F. App'x 469, 473 (11th Cir. 2009) (citing Kilgore v. Thompson & Brock Mgmt., Inc.,93 F.3d 752, 754 (11th Cir. 1996)).

assumed the worst.  She gave South University no opportunity to live up to its promise to protect her from the retaliation she feared would occur in the future.

For these reasons, no reasonable jury could find under the law that Wingfield can establish the unlawful termination claims in Counts III and IV of the Amended Complaint.

**III.**     <u>Counts V and VI</u>:  **South University Provided Wingfield With a Reasonable Accommodation for Her Impairment**

In addition to the fact that Wingfield failed to establish that she suffers from a statutorily covered disability, the Court finds that the reasonable accommodation claim in Counts V and VI fail for another reason.  South University did not fail to provide Wingfield with a reasonable accommodation for her alleged disability.  In fact, South University initially provided Wingfield with a legally sufficient accommodation and, after about a month, granted Wingfield the accommodation she requested.

It is undisputed that Wingfield could have sat on a stool to teach the additional lab course that South University wanted her to teach.[76]  Although it may be disputed whether South University put the stool in the classroom for Wingfield's or another teacher's benefit, the stool was nevertheless there.  Wingfield testified in her deposition that she had taught sitting down in a wheelchair before.[77]  Therefore, she conceded it was possible to teach a lab course from a chair.  Clearly, it was not Wingfield's preference to do so.  In her affidavit, she stated that her teaching style required her to stand.[78]  The law, however, does not force employers to provide any accommodation that a disabled employee requests, particularly where the request is based on

_____

[76] Doc. 44-1 at 131-33.

[77] Doc. 44 at 61-67.

[78] Doc. 58-2 at 1 ¶ 3.

style rather than necessity.[79]  "[U]nder the ADA a qualified individual with a disability is not entitled to the accommodation of her choice, but only to a reasonable accommodation."[80]

A month after Wingfield requested to be excused from teaching the extra lab course, South University granted Wingfield this accommodation.  It allowed her to return from unpaid sick leave, with her lost salary retroactively restored, without teaching the additional lab course. At this point, Wingfield refused to return because she did not want to report to Parrish.  But her unwillingness to report to Parrish was a new condition, and it had nothing to do with accommodating her physical impairment.  Therefore, Wingfield cannot claim that South University failed to grant her a reasonable accommodation under the ADA when, in fact, it granted her the accommodation she originally requested.

## IV.    Count VII:  Wingfield's Retaliation Claim Fails for Multiple Reasons

Although Wingfield failed to establish that she suffers from a statutorily covered disability, this failure does not automatically prevent her from bringing a retaliation claim. Wingfield can bring a retaliation claim under the ADA if she establishes that she had "a reasonable belief" that she was disabled, or was regarded as disabled, and therefore was entitled to an accommodation under the ADA.[81]

To show she acted out of a "reasonable belief" about her disability, Wingfield "must not only show that [she] subjectively (that is, in good faith) believed that [her] employer was

---

[79] Stewart v. Happy Herman's Chesire Bridge, Inc., 117 F.3d 1278, 1285-86 (11th Cir. 1997).

[80] Id. (internal citations and quotation omitted).

[81] Roberts v. Rayonier, Inc., 135 F. App'x 351, 357-58 (11th Cir. 2005) (citing Weeks v. Harden Mfg. Corp., 291 F.3d 1307, 1312 (11th Cir. 2002) and Little v. United Technologies, 103 F.3d 956 (11th Cir. 1997)). Roberts is analogous to Wingfield's case.  In Roberts, the plaintiff sought an accommodation for alcoholism, which he claimed was a statutorily covered disability under the ADA.  The Eleventh Circuit found that his alcoholism was not a statutorily covered disability, but allowed his retaliation claim to survive summary judgment.

engaged in unlawful employment practices, but also that [her] belief was objectively reasonable in light of the facts and record presented.  It thus is not enough for a plaintiff to allege that [her] belief in this regard was honest and bona fide; the allegations and record must also indicate that the belief, though perhaps mistaken, was objectively reasonable."[82]  "The objective reasonableness of an employee's belief . . . must be measured against existing substantive law."[83]

For the same reasons that Wingfield failed to show that she suffers from a statutorily protected disability, the Court also finds that her belief that she was exercising rights under the ADA could not have been objectively reasonable.  Given the substantive law that existed in April 2008 and the utter lack of evidence that her impairment substantially limited her ability to walk or stand, Wingfield's belief that her leg impairment constituted a statutorily protected disability was not objectively reasonable.

Even if her belief had been "objectively reasonable," Wingfield's retaliation claim would fail for two additional reasons.  First, she cannot establish a prima facie case of retaliation. Second, even if Wingfield had made out a prima facie case, she did not offer sufficient evidence of pretext to rebut South University's non-discriminatory reasons for its actions.

### A.      *Wingfield Cannot Establish A Prima Facie Retaliation Claim*

In order to make out a prima facie case of retaliation under the ADA, Wingfield must show: (1) a statutorily protected expression, (2) an adverse employment action, and (3) a causal link between the protected expression and the adverse action.[84]  Because an ADA retaliation

---

[82] Id.

[83] Clover v. Total Sys. Servs, Inc., 176 F.3d 1346, 1351 (11th Cir. 1999).

[84] Stewart, 117 F.3d at 1287 (internal citations omitted).

claim mirrors a Title VII retaliation claim, "we assess ADA retaliation claims under the same framework we employ for retaliation claims arising under Title VII."[85]

### 1. Statutorily Protected Expression

South University argues that Wingfield failed to establish the first element of a prima facie retaliation claim: that Wingfield engaged in a statutorily protected expression. South University does not dispute that an employee who exercises her right to request a reasonable accommodation for a disability engages in statutorily protected expression.[86] Instead, South University argues that Wingfield's request was not "statutorily protected" because she did not adequately inform South University about her disability. The Court agrees.

If the disability for which Wingfield was requesting a reasonable accommodation was a leg impairment or shin splits, she did not give South University proper notice. Wingfield's notice of her disability and her request for an accommodation came in two stages. First, Wingfield sent an e-mail and a letter to Parrish on April 15, 2008 and April 22, 2008 that included statements such as: "my stress level is extremely high," and "I came to you in fear of my life, fearing that I might stroke out if I have an increase in my duties."[87] These letters contain the sort of "[v]ague or conclusory statements revealing an unspecified incapacity [that] are not sufficient to put an employer on notice of its obligations under the ADA."[88] South University could have concluded that Wingfield was complaining about mental stress caused by having too

---

[85] Id.

[86] See Norman v. S. Guar. Ins. Co., 191 F. Supp. 2d 1321, 1335-36 (M.D. Ala. 2002) (finding that an employee engages in statutorily protected expression, satisfying the first element of an ADA retaliation claim, by requesting a reasonable accommodation for an ADA disability).

[87] Doc. 46 at 120, 127.

[88] Morisky v. Broward County, 80 F.3d 445, 448 (11th Cir. 1996).

much work, especially in light of the fact that the accommodation requested was not to assign her additional duties.

Wingfield followed her April 15, 2008 letter with an April 17, 2008 letter from her chiropractor and an April 21, 2008 letter from her primary care physician. The physician's letter said Wingfield's progress was in treatment for stress. It stated that she was unable to accept additional duties as it will interfere with her physical and mental well being.[89] The letter did not mention a disability. Nor did it indicate that Wingfield's ability to walk or stand were substantially limited. The chiropractor's letter said Wingfield was being treated for "Cervical hyperflexion/extension injury complicated by cervical and thoracic segmental dysfunction," and that she was progressing slower than anticipated due to high stress levels. It also did not mention a disability. It did not suggest that Wingfield's ability to walk or stand were substantially limited.

Because South University was not put on notice that Wingfield had a statutorily protected disability for which she was requesting an accommodation, Wingfield cannot establish that she engaged in an expression protected by the ADA.

2.     Adverse Employment Action

South University also argues that it did not take an adverse employment action against Wingfield when it placed her on unpaid sick leave. The Court does not agree. A jury could find that placing Wingfield on unpaid sick leave constitutes an adverse employment action even though South University tried to retroactively pay Wingfield for her lost salary a month after playing her on unpaid sick leave.

---

[89] Doc. 46 at 122-23.

For an employment action to be considered adverse, it "must either be an ultimate employment decision or else must 'meet some threshold level of substantiality.'"[90] Ultimate employment decisions include termination, failure to hire, or demotion.[91] To meet a "threshold of substantiality" an employment action must be "objectively serious and tangible enough to alter [the employee's] compensation, terms, conditions, or privileges of employment, deprive him or her of employment opportunities, or adversely affect [] his or her status as an employee. . . ."[92]

Other district courts in the Eleventh Circuit have concluded that "[r]equiring an employee to take leave without pay could be considered an adverse employment action as it directly affects the employee's compensation."[93] The Court agrees that Wingfield's unpaid sick leave altered Wingfield's compensation, as well as the terms, conditions and privileges of her employment. While on sick leave, she did not receive her salary and could not teach.

The Court cannot credit South University's argument that Wingfield's compensation would not have been altered if she had applied for short-term disability, as South University suggested. South University has not established that Wingfield's short-term disability would have been identical to her compensation or that taking short-term disability in April 2008 would not have altered the terms of her employment. For example, the Court does not know if taking

---

[90] <u>Stavropoulos v. Firestone</u>, 361 F.3d 610, 616-17 (11th Cir. 2004) (quoting <u>Bass v. Bd. of County Comm'rs, Orange County, Fla.</u>, 256 F.3d 1095, 1118 (11th Cir. 2001)).

[91] <u>Id.</u> at 617 (citing <u>Wideman v. Wal-Mart Stores, Inc.</u>, 141 F.3d 1453, 1456 (11th Cir.1998)).

[92] <u>Gupta</u>, 212 F.3d at 588 (internal quotations and citations omitted).

[93] <u>Kinsey v. City of Jacksonville</u>, No. 3:01-cv-785-J-32-MCR, 2005 WL 3307211, at *8 (M.D. Fla. Dec. 6, 2005) (analyzing a FMLA retaliation claim) (internal citations omitted). <u>See also</u> <u>Knight v. Computer Sciences Raytheon</u>, No. 6:00-cv-1563-Orl-28-DAB, 2002 WL 32818520, at *14 (M.D. Fla. Oct. 25, 2002) (noting in dicta that "being placed on unpaid suspension and unpaid medical leave can be considered adverse employment actions.").

short-term disability in April 2008 would have prevented her from using short-term disability later, when she may have needed it. South University has simply not provided the Court with sufficient information to rule in its favor on this point.

Finally, South University argues that it did not take an adverse action against Wingfield because, within a month, it reversed its decision to place Wingfield on unpaid leave and retroactively deposited her missed salary into her bank account. (Wingfield, who had already retained counsel, reversed the bank transfer.) Although South University retroactively tried to pay Wingfield, it did not do so for a month. By that time, Wingfield had lived without her salary for 31 days. The fact that South University attempted to undo its action does not change the adverse nature of the action at the time it occurred. The retroactive deposit does not "erase all injury associated with it, specifically the lost value and use of the funds during the time she was not receiving them."[94] It is true that a "proposed action that is corrected as soon as the proper official is made aware of it and before it goes into effect, *so that the employee does not actually suffer any consequence*, is not adverse."[95] But the Eleventh Circuit has held in <u>Crawford v. Carroll</u>, an analogous Title VII case, "that a retroactive pay raise [cannot] undo the harm caused by a discriminatory or retaliatory act."[96] "[S]uch a decision could permit employers to elude liability for conduct that otherwise is actionable."[97] Therefore, Wingfield has established for summary judgment purposes that she suffered an adverse employment action.

---

[94] <u>Crawford v. Carroll</u>, 529 F.3d 961, 972 (11th Cir. 2008) (internal citation omitted).

[95] <u>Gupta v. Fla. Bd. of Regents</u>, 212 F.3d 571, 588 (11th Cir. 2000) (emphasis added) (analyzing a Title VII retaliation claim), <u>abrogated on different grounds</u>, <u>Crawford v. Carroll</u>, 529 F.3d 961, 970-72 (11th Cir. 2008).

[96] <u>Crawford</u>, 529 F.3d at 972.

[97] <u>Id.</u>

3.     Causal Link Between Protected Expression and Adverse Action

For summary judgment purposes, South University does not contest that a causal link exists between Wingfield's request for an accommodation, which was complete on April 21, 2008, and her placement on unpaid sick leave on April 30, 2008. Therefore, the Court assumes, without deciding, that Wingfield has met the third and final element of her prima facia retaliation case.

**B.**     *Wingfield Failed to Present Adequate Evidence of Pretext*

If Wingfield establishes a prima facie case, the burden shifts to South University to present a legitimate, non-discriminatory reason for its actions. Wingfield must then demonstrate that the non-discriminatory reasons "are a pretextual ruse designed to mask retaliation."[98]

South University has clearly presented a legitimate, non-discriminatory reason for putting Wingfield on unpaid medical leave: a belief that she was not able to continue her duties as a nursing instructor and a concern for her health. Parrish had e-mailed Wingfield just before placing Wingfield on unpaid sick leave, "Please know that your health is of paramount importance in this matter."

Wingfield, however, has failed to present evidence to create a genuine issue of material fact for a jury to find evidence that South University's legitimate reasons are a pretext for discrimination. Wingfield's arguments are based on the letters South University received *after* placing Wingfield on unpaid sick leave. After South University received the follow-up letters from Wingfield's medical providers, as well as from Wingfield herself, Coble acknowledged that the school had made a mistake about the extent of Wingfield's condition. Wingfield's medical

---

[98] Id.

providers did not, in fact, consider her at risk for a stroke. However, at the time it took the adverse action, South University did not have these follow-up letters. It had Wingfield's letter, in which she warned that she might "stroke out." Therefore, the Court finds that Wingfield has not presented sufficient evidence that South University's non-discriminatory reason for placing her on unpaid sick leave are a pretext.

## CONCLUSION

As to all remaining Counts in the Amended Complaint, South University's motion for summary judgment (Doc. 55) is **GRANTED**.

The Court directs the Clerk to enter a judgment in favor of Defendant South University of Florida, Inc., and against Plaintiff Lynell B. Wingfield on all remaining counts of the Amended Complaint. The Clerk is then directed to close the case.

The Pretrial Conference and all other hearings are cancelled.

**IT IS SO ORDERED**.

Done in Tampa, Florida on June 15, 2010.


SUSAN C. BUCKLEW
United States District Judge